An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-49
NORTH CAROLINA COURT OF APPEALS

Filed: 1 July 2014

STATE OF NORTH CAROLINA,
      Plaintiff,

v.                                        Wake County
                                          No. 11 CRS 211595

WILLIAM DAMIEON EDWARDS,
      Defendant.


Appeal by William Damieon Edwards from judgment entered 21 May 2013 by Judge Michael J. O'Foghludgha in Wake County Superior Court. Heard in the Court of Appeals 6 May 2014.

> *Attorney General Roy Cooper, by Assistant Solicitor General Gary R. Govert, for the State.*
>
> *PARISH & COOKE, by James R. Parish, for defendant.*


ELMORE, Judge.

This case arises out of the shooting death of Jay Waheed Ammeri (Mr. Ammeri) on 19 May 2011 at the New York Style Pizza restaurant in Raleigh. William Damieon Edwards (defendant) was charged with first degree murder and possession of a firearm by a felon in connection with this shooting death and was tried before a jury. The jury found defendant guilty of first degree murder. Defendant pled guilty to the firearm offense, and the

trial court sentenced defendant to life imprisonment without parole plus 14-17 months on the firearms charge, to be served at the expiration of the life sentence. After thorough review, we find that defendant received a fair trial, free from error.

## I. Background

The facts of this case are largely undisputed. Evidence at trial tended to show, in relevant part, that at approximately 8:03 p.m. on 19 May 2011 defendant shot and killed Mr. Ammeri. Defendant's wife, Teresa Edwards (Mrs. Edwards), testified to having had a year-long extramarital affair with Mr. Ammeri, who was also married. In the summer of 2010, defendant learned of his wife's affair. Waheeda Ammeri (Mrs. Ammeri), Mr. Ammeri's wife, testified that sometime between July and September of 2010, defendant and his friend, William Nelson (Mr. Nelson), confronted her at the Ammeri residence. Defendant asked Mrs. Ammeri, "[d]o you know if your husband is cheating on you?" Mr. Nelson testified that defendant "proce[ed] to tell [Mrs. Ammeri] that his wife and her husband was having an affair." The then seven-months pregnant Mrs. Ammeri responded that Mr. Ammeri was "absolutely not" having an affair because "[h]e's not that type of person." That same afternoon, Mr. Nelson drove defendant to Mr. Ammeri's car lot because defendant wanted Mr. Nelson to

"beat [Mr. Ammeri's] tail." Mr. Nelson testified that he did not physically assault Mr. Ammeri at that time, but he told Mr. Ammeri to "leave [Mrs. Edwards] alone, to go on about his business, she [is]n't worth it, you know, to just let her go."

Mrs. Edwards testified that she ended the affair with Mr. Ammeri after she learned defendant confronted Mrs. Ammeri at the Ammeri residence. Prior to that incident, Mrs. Edwards alleged that she was unaware that Mr. Ammeri was married. Although defendant learned of his wife's affair in the summer of 2010, it was not until January 2011 that Mrs. Edwards herself admitted to defendant that she had had sex with Mr. Ammeri. In response, defendant, who was intoxicated, choked his wife, pushed her down, and broke the humerus bone in her arm. Mrs. Edwards was prescribed hydrocodone pills for pain associated with the broken arm. Mrs. Edwards forgave defendant and testified that their marriage was "great" in the following months.

On 19 May 2011, defendant took two of Mrs. Edward's hydrocodone pills before going to the VA hospital for a follow-up doctor's appointment. During his appointment, defendant was diagnosed with sarcoidosis, a condition that causes chronic inflammation of certain organs. Mr. Nelson testified that he spoke with defendant at 5:10 p.m. that afternoon and defendant

was not intoxicated. Defendant's bank records indicate that at 5:14 p.m. he purchased Colt 45 beer, an alcoholic beverage containing twelve percent alcohol. At 7:32 p.m., Mr. Nelson testified that he received a second call from defendant, who now sounded highly intoxicated and was "babbling." During that call, defendant told Mr. Nelson that he was "going to go in there and take care of it." At 7:53 p.m., the men spoke again for nine minutes. Defendant then entered the back door of the pizza shop with a pistol in hand and, after conversing briefly with Mr. Ammeri, shot him in the heart. At 8:06 p.m., defendant called Mr. Nelson, said "it's done," and hung up.

Defense witness, forensic psychiatrist Dr. George Patrick Corvin, testified that defendant's cognitive functioning and impulse control were greatly impaired when he committed the murder due to defendant's consumption of alcohol and hydrocodone, the problems in his marriage, and the stress over his recent diagnosis.
Dr. Corvin opined that defendant was operating in a state of alcoholic "blackout" when he shot Mr. Ammeri. A "blackout" can occur when one's blood alcohol level rises fast enough that the temporal lobe circuitry becomes dysfunctional. Forensic psychiatrist Dr. Mark Hazelrigg interviewed defendant after the

shooting and testified for the State. In Dr. Hazelrigg's opinion, defendant had the cognitive capacity to form a specific intent to kill Mr. Ammeri because defendant 1) willingly purchased and consumed Colt 45, 2) drove to Mr. Ammeri's place of business, 3) called Mr. Nelson and stated that he's "going to take care of it," and 4) informed Mr. Nelson "it's done." During closing arguments, defense counsel argued that defendant committed an "impulsive killing" and therefore requested that the jury find defendant guilty of second degree murder. However, the jury returned a guilty verdict for first degree murder, which defendant now appeals.

## II. Analysis

Defendant argues the trial court erred by denying his request to give his proposed jury instructions on first degree murder. We disagree.

Defendant preserved this argument for appellate review when he objected to the trial court's decision to deny his request for the supplemental instructions and instead used the pattern jury instructions. *See* N.C.P.I.—Crim. 206.13. On appeal of the trial court's refusal to use proposed jury instructions,

> [t]he party asserting error bears the burden of showing that the jury was misled or that the verdict was affected by [the] instruction . . . . [I]t is not enough for

> the appealing party to show that error occurred in the jury instructions; rather, it must be demonstrated that such error was likely, in light of the entire charge, to mislead the jury.

*State v. Blizzard*, 169 N.C. App. 285, 297, 610 S.E.2d 245, 253 (2005) (citation and quotation omitted). If a defendant requests instructions that are "correct in law and supported by the evidence, the court must give the instruction in substance," not verbatim. *State v. Ball*, 324 N.C. 233, 238, 377 S.E.2d 70, 73 (1989). "'[W]hether the trial court instructs using the exact language requested by counsel is a matter within its discretion and will not be overturned absent a showing of abuse of discretion.'" *State v. Lewis*, 346 N.C. 141, 145, 484 S.E.2d 379, 381 (1997) (quoting *State v. Herring*, 322 N.C. 733, 742, 370 S.E.2d 363, 369 (1988)).

Defendant requested that the trial court supplement portions of the pattern jury instructions to instruct the jury on factors that could show a lack of intent, premeditation, and deliberation, including the mental condition of the defendant, as follows:

> Premeditation involves the idea of prior consideration. *State v. Exum*, 138 N.C. 599 (1905).
>
> . . .

[D]efendant acted with deliberation, which means that he weighed the consequences of his actions and acted while in a cool state of mind or with a fixed purpose, and not as a result of a sudden impulse without the exercise of reasoning powers. *See State v. Hunt,* 330 N.C. 425, 429 (1991). Deliberation indicates reflection, a weighing of consequences of the act in more or less calmness. *State v. Exum*, 138 N.C. 599 (1905). Deliberation refers to a steadfast resolve and deep-rooted purpose, or a design formed after carefully considering the consequences. *State v. Thomas*, 118 N.C. 1113 (1896).

. . .

Likewise, the absence of either premeditation or deliberation may be inferred from circumstances, such as the mental or emotional condition of the defendant at the time of the killing. The true test is not the duration of time as much as it is the extent of the reflection. *State v. Buchanan*, 287 N.C. 408,215 S.E.2d 80 (1975)). [sic]

. . .

[T]he intent to kill must arise from a fixed determination previously formed after weighing the matter. (*State v. Myers*, 309 N.C. 78, 305 S.E.2d 506, 509 (1983)). The true test of deliberation, is the extent of the reflection upon the matter as opposed to the duration of the time of the reflection. *State v. Buchanan*, 287 N.C. 408, 418, 215 S.E.2d 80 (1975)). [sic] In common terms, to premeditate a killing the killer must ask himself, "Shall I kill him?". [sic] The intent to kill aspect is found if the killer answers, "Yes, I shall." The deliberation

part of the crime requires a thought like, "Wait, what about the consequences?[] Well, I'll do it anyway."

The trial court declined to give defendant's jury instructions and instead instructed the jury utilizing the North Carolina pattern jury instructions. As to the element of intent, the trial court instructed the jury as follows:

Third, that the defendant intended to kill the victim. Intent is a mental attitude seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. Intent to kill may be inferred from the nature of the assault, the manner in which it was made, the conduct of the parties, and other relevant circumstances.

Defendant proposed adding: "Likewise, the absence of intent to kill may also be inferred from relevant circumstances, such as the mental condition of the defendant at the time of the assault."

As to the elements of premeditation and deliberation, the trial court instructed:

Fourth, that the defendant acted with premeditation, that is, that the defendant formed the intent to kill the victim over some period of time, however short, before the defendant acted.

And fifth, that the defendant acted with deliberation, which means that the defendant

> acted while the defendant was in a cool state of mind. This does not mean that there had to be a total absence of passion or emotion. If the intent to kill was formed with a fixed purpose, not under the influence of some suddenly aroused, violent passion, it is immaterial that the defendant was in a state of passion or excited when the intent was carried into effect.

Initially, we note that defendant does not contend that the instructions provided by the trial court were incorrect. Instead, he suggests that the pattern instructions were inadequate because they failed to communicate that "defendant's abilities to specifically intend to kill, premeditate, and deliberate were significantly impaired." Also, defendant's brief fails to cite any case demonstrating that the trial court's instructions, without defendant's requested additions, were in error. Further, defendant does not allege in his brief that any error by the trial court misled the jury. *Blizzard, supra*.

After reviewing defendant's instructions, it is evident that he sought to emphasize that the *absence* of intent, premeditation and deliberation may be inferred from the circumstances, likely to advance the theory that he was guilty of only second degree murder due to his mental state and

intoxication. Our Courts have held that the portions of defendant's requested instructions constituted restatements of the same directives as included in the pattern instructions and are therefore unnecessary. *See, e.g., State v. Wallace*, 351 N.C. 481, 525, 528 S.E.2d 326, 353, *cert. denied*, 531 U.S. 1018, 121 S. Ct. 581, 148 L. Ed. 2d 498 (2000) (finding no error in the trial court's rejection of very similar instructions proposed by the defendant because the "[d]efendant's proposed instructions merely articulate[d] variations on the definition.") A review of the pattern instructions shows they provide an accurate definition of intent, premeditation, and deliberation. "Defendant's proposed instructions merely articulate variations on [these] definition[s]." *Id*.

In addition, defendant failed to recognize that the trial court also instructed the jury on diminished mental capacity, stating: "if you find that the defendant was intoxicated or was drugged or lacked mental capacity, you should consider whether this condition affected the defendant's ability to formulate the specific intent which is required for conviction of first-degree murder." Accordingly, the jury was adequately instructed that defendant's mental state and level of intoxication were relevant. We find no merit in defendant's argument that it was

error for the trial court to instruct using the pattern jury instructions because the instructions "did not address the defense evidence" that "defendant's abilities to specifically intend to kill, premeditate, and deliberate were significantly impaired." Because the trial court's instructions substantively stated that which defendant requested, we overrule defendant's argument.

No error.

Judges McGEE and HUNTER, Robert C., concur.

Report per Rule 30(e).